187 So. 425

**STANLEY v. SAWYER.**

7 Div. 520.

Supreme Court of Alabama.

Feb. 23, 1939.

Rehearing Denied March 30, 1939.

Isbell & Beck and Scott & Dawson, all of Fort Payne, for appellant.

E. M. Baker and L. L. Crawford, both of Fort Payne, and Goodhue & Lusk, of Gadsden, for appellee.

THOMAS, Justice.

The appeal presents the question of whether or not the will filed in the probate court was, in fact, executed by J. P. Stanley, or under his direction. The contestant demanded a jury and the verdict was for proponent.

The facts of the execution of the will are stated by Mrs. Viola LeFurgey, a witness to and beneficiary under the alleged will, as follows:

"It was on the 7th day of October, 1933. The occasion which brought us to Fort Payne was the death of Mrs. W. M. T. Ware, Mr. LeFurgey's grandmother. We were attending her funeral. The time of day that we went to Mr. Stanley's home on October 7th was late in the·afternoon. My husband went with me. After being in the home, the first thing that was said was that Mr. Stanley· called us together. I was in the kitchen and Mr. LeFurgey was in the living room and Mr. Stanley was in the dining room. We both went into the room. I called my husband. After we got in the room, the three of us together with Mr. Stanley, said this is a rather touching sad time—Mrs. Wear's death—and he said he had this paper, his will, he wanted us to sign in his presence. After telling us he wanted us to sign a paper or will, he signed the will. He got the will out of his desk. He went to the desk and got the will after he called us. He got the will from a desk or an old piece of furniture, he called it his desk, his business was there. My husband was there at the time he signed it. My husband signed it and then I signed it. We were both present and Mr. Stanley, all three present at the time he signed it and at the time we both signed it. After the instrument was signed, Mr. Stanley took it and put it back in his desk and the next time, I saw the paper was the following March or early Spring when my husband had it. He had it in his hand and it was at Irondale. My husband had prior to that time visited in Fort Payne and when he got back he showed me this paper. I looked at it and it was the same one that me and my husband and Mr. Stanley had signed. I later brought the will back to Mr. Stanley. It was in the Fall of 1934 when I brought it back to Fort Payne. I gave it to Mr. Stanley and Mr. Stanley said, 'I am going to return this to you before you return home.' I saw the paper the next day when I was preparing to go home. Mr. Stanley gave me the will and said 'Keep the will and send it in within thirty days after my death.' He said, 'Just keep it and say nothing until that time is up.' When he gave me the will, there was another piece of paper clipped to it. I took the will back home with me and put it in a safe place. I kept it in the home among my private papers. I kept it there until it was sent to Mr. Sawyer. It was thirty days after Mr. Stanley's death. In the meantime between the time of Mr. Stanley's death and the sending of the will to Mr. Sawyer I came to Fort Payne. I went to the funeral up North. My husband went with me. I came back to Fort Payne about thirty days after Mr. Stanley's death. I mailed

the will from Chattanooga, Tennessee. Mrs. Kuhlo lives in Chattanooga, Tennessee. She is a relative of Mr. Stanley. She is mentioned in the will. I mailed the will in Chattanooga to Mr. Sawyer. While I was up there. * * * I went through Fort Payne going to Chattanooga. I went on the train. My baby went with me. No, my husband didn't go. I went on 42 and got in Chattanooga sometime about eleven o'clock in the day time. I did not see anybody that I know. I did not see Mrs. Kuhlo. Mrs. Kuhlo lives in Chattanooga. I was well acquainted with her. I did not prepare the envelope for mailing. Mr. John P. Stanley prepared it. I did not see him prepare it. He gave it to me. Mr. Stanley gave it to me when he gave me the will in the Fall of 1934. He had it addressed like that. I didn't see Mary Kuhlo nor her daughter when I was in Chattanooga. * * *

"I did not tell any person that I had a will but only that I knew there was will made. I told Mr. Sawyer and I told Mr. Beck that there was a will at one time made. I did not at the time I signed this will see Mr. Stanley write it. I did not see him use the typewriter. The will was folded up. He took it out of the drawer and into his hand and opened it up. It wasn't a long sheet like that. I couldn't say whether it was folded or not. I can remember about his folding it up but I don't remember whether it was folded like it was or whether it had been folded before he returned it. I read the will. We did not discuss the contents of it. It was over a year before he turned it over to me. * * *"

The account of the execution of the will by the other witness to the alleged will, and a beneficiary under it, W. J. LeFurgey, is: "* * * He said he had a will made and he wanted us to witness it. He took the will from an old secretary desk, a piece of furniture he used as a desk. To the best of my recollection, it had been folded one time. Here counsel hands witness paper. This is my signature. At the time I signed my name to this paper Mr. Stanley had signed it in my presence and in the presence of my wife. Mr. John P. Stanley signed first and I signed next as a witness and then my wife signed. We were all present in the house in the same room. In the dining room. It was on the dining room table. After it was signed and after my wife had signed it there wasn't anything done with it. It was left lying on the table and he returned it to the desk. I believe he folded. it. * * * I stayed part of the day with Mr. Stanley and part of the day with my mother. He gave me this will then. He said he wanted a copy of the will made. I took the will home with me. I did not later give the will to my wife, but she knew that I had it. I showed it to her. I gave it to her something like three months later I gave it to her and told her to deliver it to John P. Stanley. The next time I saw it was when it was in Mr. Sawyer's office in Fort Payne. * * *."

Mr. Sawyer, the proponent, said:

"I am the executor named in the will offered for Probate. I received the will through the mail. I know Mr. Stanley lived in Fort Payne. * * *

"I received all these letters from Mr. Stanley through the mail which are marked exhibits 1, 2, 3, 4, 5, and 6. I have had business transactions with Mr. Stanley and have seen him write. The signatures to the letters which I have just examined are the signatures of Mr. Stanley."

The proponent having rested, contestants offered Mr. Wolfes as a witness. The following questions were propounded to said witness:

"Did you at their request come to my office and inquire of me as to whether or not Mr. Stanley made a will?

"I will ask you whether or not you came to my office and asked whether or not Mr. Stanley made a will?".

The court sustained objections to these questions and there were due exceptions thereto.

▪ The first question did not fall within the rule of a privileged communication. Sovereign Camp, W. O. W., v. Prichett, 203 Ala. 33, 81 So. 823; 70 C.J. 426, § 569. There was error in the ruling of the court for these questions were not calling for privileged communication between attorney and client, but the answers thereto would illustrate the interest and acts through the attorney of the two witnesses and beneficiary in the will. The last question shed an illuminating light upon the question of interests and the question was competent evidence when taken in connection with the attempted inquiry and the statement of the witness, "I was employed by Mr. & Mrs. LeFurgey."

▪ The following questions were erroneously denied to contestant:

"I will ask you, Mr. Wolfes, if you didn't send Mr. W. J. LeFurgey and Mrs. Viola LeFurgey and Mrs. Mary Kuhlo to my office to ascertain whether or not Mr. J. P. Stanley had ever made a will?"

"I will ask you if you didn't search the records in the Probate Office in Fort Payne, DeKalb County for Mr. and Mrs. W. J. LeFurgey?"

■ The importance of the foregoing questions and the statement of contestant's counsel to the court: "We want the record to show that we, expected an affirmative answer to each of the several questions hereinabove asked to which the court sustained objections," was that it was a communication between an attorney and third persons and the answers are not privileged communications. Sovereign Camp, W. O. W. v. Prichett, 203 Ala. 33, 81 So. 823; 70 Corpus Juris, p. 415, § 556.

The witness Campbell testified that he was present in office of the attorney for contestant when Mr. and Mrs. LeFurgey came in and asked counsel, "We want to know whether or not Mr. Stanley ever made a will?" Witness stated, "I was in the hall of the office waiting to see Mr. Beck." On cross-examination he testified further: "That was about the last of December of last year. He wanted to know if a will had been made. It was after Christmas, between that and the first of the year."

■ The testimony of Mrs. Baxter, who was Mr. Stanley's housekeeper, contradicted the testimony of the LeFurgeys as to spending the night with Mr. Stanley or coming to his house the next day at the time Mrs. Wear died. There was error in declining the question: "Did he ever tell you the LeFurgeys, about the time Mrs. Wear died, if Viola and Mr. LeFurgey spent the night there?" The witness further testified:

"During the time prior to Mr. Stanley's death since October 7, 1933, I have talked over business affairs with him lots of times. In some of these conversations we had talked about a will. He said he had not made a will. In my best judgment I talked to him a number of times. A short time before he died, I asked him a direct question, I would say six months before his death, and he said no. In those conversations Mr. Stanley would talk about Viola LeFurgey lots of times. He didn't say anything that he would leave her anything. He said: 'Before I would leave Viola a dime I would leave everything to an orphanage.' No one was present when that statement was made. He did not make that statement to me more than once, not those exact words. He never indicated that he would leave them anything. He didn't like the way Viola did after Mrs. Stanley's death. The feeling was not so good between Viola and Mr. Stanley after Mrs. Stanley died. He told her to come up after they got back from Cincinnati and he would give her some of Mrs. Stanley's clothes. When she come he turned her loose in the house and he said she got lots of things she wasn't supposed to get. He said that ruined Viola with him. After Mrs. Stanley died he said that. I can't say how long after Mrs. Stanley's death Viola came down there but it was pretty soon after he got back. They were up in Cincinnati for Mrs. Stanley's funeral. The LeFurgeys did not visit Mr. Stanley often, they just visited in the home one time after we moved. We moved in 1934. I know that they did not both together visit in Mr. Stanley's home from the time of Mrs. Stanley's death until I moved in. Mrs. LeFurgey was just there one time and Will came in and talked to Mr. Stanley several times, but he never spent the night while I was there. * * * After Mr. Stanley's death, the LeFurgeys were in the home. They got there the day of the funeral. I sent them a telegram. Mr. Stanley had a list of addresses he gave me when he went to the hospital. * * * I had all of those notified. After Mr. Stanley died the LeFurgeys came up. I had a conversation with them. In that conversation they asked me if Mr. Stanley made a will. I don't know whether both were present, I know Will did. I don't remember Mrs. LeFurgey asking about a will, but Will LeFurgey asked about a will. * * * It was when they came back after the funeral and in that conversation they stated that they had talked with their lawyer and the lawyer told them they did not have any claim. Will LeFurgey, Viola LeFurgey and Mary Kuhlo were present and Mr. Houston Baxter was there. They wanted to search the house for a will. They came over there one time. They said they wanted to come in the house and search for a will."

The several questions and answers asked by proponent on cross-examination were

properly admitted as tending to show interest, prejudice or bias.

· The checks in evidence and used by an expert witness for contestant were duly authenticated by President Weatherly of the bank with which alleged testator did business. There were many checks of Mr. Stanley offered in evidence. The expert used checks numbered 1, 2, 3, and 4. Mr. Weatherly testified: "I have stated that I know Mr. Stanley's signature. Here counsel hands the witness the purported will in question. I will ask you to examine that signature (indicates on will) and state whether or not it is Mr. Stanley's signature. Answering, witness said: I don't believe it is. That is my best judgment."

Mr. Weatherly further testified that Mr. Driskill, Mr. Appleton and Mr. Gravitt were employes of the bank and had knowledge of and had handled such matters.

Mr. Weatherly, among other things, testified as follows:

"I have testified that in my opinion this is Mr. Stanley's signature (indicating). There is a peculiarity about every man's writing. No two people write the same. It is like a face. There is a mental picture that flashes, just like I meet you in the street and I recognize you by certain peculiarities. I can't tell the jury what they are. I don't think about your height or the color of your hair when I see you, there is just a picture. The picture is Leonard Crawford. I know you by the peculiarities in my mind because I have never studied the peculiarities. I may know them, but I don't know you by them. The peculiarity that I recognize in this as being Mr. Stanley's signature is different from any other man's signature, the forming of the letters is different. No man writes exactly the same signature every time, nothing else is ever identical. There are certain peculiarities or characteristics about every man's signature that we recognize them by. I stated in my opinion I don't think Mr. Stanley signed this (indicating paper purporting to be the will). I wouldn't say he didn't. I just say in my best judgment that I don't think he signed it. He could have signed it but in my best judgment he didn't sign it. I never saw him sign these (indicating checks.)

· "Here counsel asked the witness the following question: Now what is there (indicating check), take that one right there, do you see anything peculiar to that check that is also peculiar to this signature?

"Answering further, witness said: They have the same characteristics. What makes me recognize the second by the first is just that I know the signature, the way the letters are formed as he formed them the way he usually wrote.

"Here witness was asked to explain in detail to the jury why he considered the signature on the will different from the signature on the checks.

"He came down from the witness chair and explained in his own words the difference in the slanting of the 'T' and the way the 'p' was written, etc.

"Here counsel asked Mr. Weatherly to take those papers (handing witness some letters) and examine the signatures to each and tell whether or not that is the signature of Mr. Stanley.

"Answering, witness said: I think they are all signed by Mr. Stanley * * *

"I notice the characteristic in Mr. Stanley's signature usually follows the line it is written on. One of the first things I saw when I looked at the signature on the purported will was that it did not follow the line. That 'S' doesn't look like his. It doesn't appear to be his kind of 'S'.

"On re-cross examination, witness testified as follows:

"Counsel hands witness a bunch of papers. Take this bunch of papers, Mr. Weatherly, and look at the 'S' see if they are made alike every time?

"Answering witness said: It is the manner in which they are written. Whether a flowing hand or a slow steady hand. Mr. Stanley wrote what I would say a free running hand, his wrist was loose and this signature here (indicating) had the appearance of having been gotten down and written in a strain this way (indicating) instead of this way.

"Here counsel propounds the following question: What do you recognize in that 'S' that you do not see in this one (indicating). Do you see any similarity?

"Answering: In one instance there is very little but they are both written with a free hand and there are other little characteristics."

Proponent offered letters received by Mr. Sawyer and identified as containing Mr. Stanley's signature which were pre-

sented to witness Weatherly, saying: "All of those 'S's' are made a little different. That 'S' is similar to the one on the will, however, it looks like it was made different. I wouldn't say that he didn't write that."

On re-direct examination, witness testified further: "(Indicating signature on will) In my best judgment that is not his signature."

Mr. Hawkins, as a witness for contestant, testified he helped to liquidate the bank of which Mr. Stanley was vice president, knew his signature, worked in that bank for more than twenty years, and identified checks numbered one and two (offered in evidence) as being Mr. Stanley's signature. Witness was doubtful about checks offered in evidence numbered three and four. This witness was asked: "Look at those checks—what do you say to those (indicating)?" Witness answered:

"They are his signature.

"Look at this paper purporting to be the will of John P. Stanley—the signature— in your judgment is that the signature of J. P. Stanley? Answer: No, sir."

The witness was asked the following questions on redirect examination and made answers thereto as follows: "I observed on those checks that Mr. Stanley is a pretty good lineman—stayed on the line pretty close. Well, it begins down near the line and goes up, considerable ascension. Looking at the signatures at the letters J. P. S. I see some difference in them in the general signature of Mr. Stanley in the 'T' and also the 'N'. Mr. Stanley begins the second part of the 'N' on the bottom. This seems to go up the line a small distance and then come up. This 'P' has a big round loop and Mr. Stanley didn't have a loop and the 'P' was not as precise as that is. * * *"

Dr. Wright, the family physician of Mr. Stanley during his last illness, testified that: "About two weeks after Mr. Stanley's death, W. J. LeFurgey and Viola LeFurgey came to my office and I had a conversation with them. They, in that conversation, asked me if there was a will and I told them that I didn't know of one. And in that conversation, they asked me if I knew of anything that would help them, and I told them nothing except his illness, but I would be glad to answer any questions about that. They asked me if I thought anything could be brought out if their lawyer consulted me."

On cross examination, Dr. Wright testified further:

" * * * about my father, and they asked if Mr. Stanley had said anything to the nurses about making a will and asked who the nurses were and where they lived. They asked me if anyone had tried to see Mr. Stanley about making a will. I told them I had a call asking if he could be seen. The call was from Brother Justice, the Baptist preacher. He said he had been informed that Mr. Stanley had considered leaving his property to the Baptist Church, and he asked if he was able to be seen and if he wanted to make a will. That was on Sunday afternoon before he died."

"I did ask Mr. Sawyer if I had a right to keep people away from there, when they were trying to get in to make a will. Mr. and Mrs. LeFurgey were talking about Mr. Stanley's last illness. They were talking about his will, whether there was one made while I was there.

"On re-direct examination, witness testified: "Brother Justice communicated with me about Mr. Stanley's condition by telephone. Well, in substance he said that Mr. Beck was Mr. Stanley's lawyer and he had given Mr. Beck reason to believe he wanted to leave his property to the First Baptist Church, and he had not made that will and wanted to know if his condition was such that he could be seen."

Witness Box of Collinsville, former cashier of the People's Bank and Liquidation Agent for the Fort Payne bank, testified that in his opinion the signature on the will in question was not Mr. Stanley's signature.

Witnesses for contestant, Smith, Guest, Horton and Malone, Hawkins and Porter, testified as to the signatures on checks in question and stated that in their opinion they were Mr. Stanley's, and that the signature on the will in question was different.

The witness Houston Baxter corroborated the testimony of his wife and stated in substance that "there was hard feelings between them" (Mr. Stanley and the LeFurgeys).

Mrs. Stewart, witness for contestant, testified as to a conversation she had with Mr. LeFurgey during the time she was nursing Mr. Stanley, and that Mr. LeFurgey said that "his wife was the same as a daughter to Mr. Stanley."

Witness Prestwood testified to a conversation with W. J. LeFurgey after Mr. Stanley's death. In the conversation Mr. LeFurgey had stated that he did not know whether or not Mr. Stanley had made a will and "if he had made any it had not showed up yet."

R. B. Justice, Pastor of the First Baptist Church, stated as follows:

"I had a conversation with him over at his home about whether or not he had made a will. I stated to him that he ought to have a will. He said he was not ready yet as he did not have his business in shape to make a will yet. He made that statement to me in his home about a year ago. I had a conversation about W. J. LeFurgey and Viola LeFurgey. * * * He intimated that she—well, he said, if you insist on it—I had rather not say—. I do it under protest, but he said that she got while getting was good, that she got more than he intended for her to get. Brother Stanley was a member of my church. He was Chairman of the Board of Deacons. I saw him more than the average member. * * * I had a conversation with Dr. Wright * * * I asked Dr. Wright if he thought Brother Stanley was in condition to make a will; he said he thought he was not."

W. M. Beck, a witness for contestant, testified that he had discussed the question of making a will with Mr. Stanley "when he was in my office" and that decedent had informed him that he was not ready that he stated "my business is not in shape like I want it." This witness further testified that Mr. and Mrs. LeFurgey had discussed Mr. Stanley's will with him and had asked him on two occasions whether or not Mr. Stanley had made a will and that they "did not say anything about having a will."

Mr. Sawyer, recalled as a witness, testified that the envelope introduced in evidence was the envelope in which he received the purported will and that it was addressed: "Office of C. M. T. Sawyer, Fort Payne, State of Alabama, with the figures 1–13–38 and the return address, Mrs. Viola LeFurgey, Irondale, Alabama, the word Special Delivery, Registered Mail, and stamped on the envelope, 'special delivery' in royal purple ink."

Dr. L. F. Schulhofer, witness for contestant, qualified as an expert on handwriting, stated that he had examined the signatures on checks of Mr. Stanley; that he selected four of the checks for illustration and the signature on the will; that he was sure that the photographs of the checks and of the will were correct and that the signature of the will, in his judgment, was a "forgery by tracing." The witness then proceeded to explain how he reached the above conclusion and said:

"Here is a photograph with five signatures: C number one, C number two, in the center the will, C number three and C number four. The signatures appearing on the C one to four are taken from four admitted signatures. The signature on the will in the center is the signature in question appearing on the will. I stated on the stand that this signature is a forgery by tracing. There are two kinds of forgery; one by copying, the other by tracing and the characteristics of these two kinds of forgery are very outstanding. What is the outstanding characteristic of forgery by tracing? Tremor, hesitation, deliberate, slow. The shading of any forged signature is prominently irregular. Then we have the abnormal movements of the writer. Now lets go to this photograph. I said the outstanding characteristic of forgery by tracing is the tremor. Now lets see what we find here in regard to tremor. I want you to look at this in the up stroke and down stroke. I want you to look at the 'A' and the up stroke of the 'J', they are full of tremor. Then come to the next character which is the irregularity of shading. In most instances the up strokes are light and the down strokes are heavy. Lets look at Mr. Stanley's writing. The up stroke in the 'S' is lighter than the down; it is very irregular in shading. This is unusually light in the up stroke but the final up stroke is just as heavy, or a little heavier than the down stroke which is unusual, abnormal. Up here the up stroke is heavy in the 'S,' the entire signature is irregular in its shading. Look at this 'E' and look at this 'Y' such unusual shading I have never seen in all my experience and years. It is absolutely abnormal and unnatural. Now we come to the formation of this capital 'P'. This started oval, is entirely too round in comparison with Mr. Stanley's 'P's'. The down stroke is unusual in comparison with the admitted writing of Mr. Stanley. In comparison with the writing of Mr. Stanley, I refer to these four checks. This stem of the 'P' is not straight in comparison with these others. The up stroke is made with

two strokes, which is unnatural with the signature of these checks. Now we come to the period. It is entirely too light, just merely a touch with the pen, which is also unnatural in comparison with these others appearing on the photograph. We come to the capital 'S'. Mr. Stanley's appearing in the four checks, are all made in an up and down stroke which is normal. In this middle signature, it is made in two strokes. The writer stopped right here, then it comes up in the center here and instead of connecting, makes this down stroke. Now lets see this down stroke, lets take these four 'Ss' which I selected for the purpose of demonstrating; the difference in the divergency, of the capital 'S'. Lets take the second one; there is an up stroke, then this stroke goes down here and forms a loop; that is the way this writer made his 'S'. Now how is it made on this will? We have an up stroke here. We stop. Then the down stroke. We come out across the up stroke of the 'T', then it stops and starts here beyond the cross of this 'S' and forms the connection of the 'T'. In my understanding, it is the outstanding forgery by tracing. In this signature now, is the final stroke of the 'T'. It is very heavy, very blunt. Lets compare it with the 'T' in the four signatures. It is tapered light. Here again and here again. This is completely untapered. The initial letter 'S' is unusually round. So is the top of the first up and down stroke of the 'N'. It is outstanding, this roundness. We come to the 'E' and 'Y'. This 'E' is made entirely different to the 'E' appearing on these four checks. The 'Y' is entirely too heavy, as I stated before, and the final stroke is light and not in line with the final stroke of the 'T'. When we compare the signature of the will with the four checks, we find an unusual amount of roundness, produced also by tracing. Forgery by tracing produces roundness and it is very prominent in this signature. A forgery by tracing means making as perfect a reproduction of an original writing as can be made. It can be done by holding it against a window, or tracing through carbon paper, or having a table with a glass; making it by looking at the other signature. * * *

"There is some other characteristic of this signature that I have not spoken of. It is a very important one; it is a question of alignment. Alignment is the writing on the line, below the line or above the line. Lets look at the alignment of these four checks. It is very well written on the line. Now lets look at the alignment on the signature of the will; this signature is at the highest point $\frac{5}{16}$ of an inch above the line, which is absolutely foreign to all the signatures I have examined. * * *."

Contestant rested the case after Mr. Beck had testified of the facts of his employment of the handwriting expert, saying that he tried to tell him the facts were denied, but the expert said that he merely wished to consider the genuine and the questioned signature.

Mr. Sawyer, being recalled, for the proponent, told of his great business experience with Mr. Stanley and that it was his judgment that the signature of Mr. Stanley to the questioned will was genuine. Witness further stated his idea of the exhibited photograph, magnified as they are, and to which the handwriting expert referred.

Witness Eddie Dean testified of his business experience with Mr. Stanley, exhibited many checks and receipts containing genuine signatures and expressed the judgment that the will was executed by Mr. Stanley.

The witness Gravitt adverted to the fact that Mr. Stanley was the President and Mr. Dorsey the Cashier of the Farmers & Merchants Bank; that he worked in the bank under Mr. Stanley as a teller, that the signature to the will was different from other signatures exhibited. This witness discussed the list of the several signatures and stated that, in his opinion, all the checks were Mr. Stanley's signature and that there was a variation in Mr. Stanley's signature.

The witness Wall, a bookkeeper in a bank, stated that the alleged will bore the genuine signature of Mr. Stanley.

Proponent introduced Mr. Driskill, who testified that he knew Mr. Stanley's signature, and that he thought the purported will bore the genuine signature of J. P. Stanley. The witness further explained the difference in the several signatures as the letters "P", "A", "Y", "J" and "T".

Mrs. Nell Jones, as a witness for proponent, said she was proof clerk in the First National Bank, handled many checks, and while she was so employed heard Mr. Stanley say he wanted his property to go to the church, and that she would recognize Mr. Stanley's signature. When the will was shown to her, this witness answered,

"In my judgment it is his." To like effect was the testimony of W. V. Jacoway and he also stated that in his judgment both are genuine signatures of Mr. Stanley; "that he was connected with the M. E. Church as a Steward."

Witness Hughes gave evidence of the conversation with Mr. Stanley when he talked about his troubles, and about him and his brother having trouble in the settlement of the father's estate and stated that decedent had stated, "I don't aim for him to (have) any of mine."

Witness Landstreet testified that he knew Mr. Stanley's signature, that the signature to the will looked mighty like Mr. Stanley's signature.

Mr. John McCartney, for proponent, testified of a conversation with Mr. Stanley, and that decedent said he had not made a will but was going to; that he had no heirs except one nephew and "I don't owe him anything."

Witness Jessie Allen, for proponent, testified that he knew Mr. Stanley, and that he had heard Mr. Stanley say "Mr. Isbell is my lawyer but I had rather for Mr. Sawyer to settle up my estate." Being shown a paper purporting to be the will, this witness stated that in his opinion it was Mr. Stanley's signature.

Mr. Walter B. Jack, for proponent, testified that he knew Mr. Stanley, that he never heard him make a statement about disposition of his property, but heard a conversation up in Mr. Crow's store in which he mentioned something about his nephew and heard Mr. Stanley say that he "didn't owe his nephew a cent in the world."

Austin Keith testified for proponent that Mr. Stanley was feeble during his last years, would stop in his place and talk about his physical condition, saying that when he went to die if his plans and arrangements were carried out, his brother would not get anything.

Mrs. Annie Lyons, for proponent, remembered when Viola LeFurgey visited the Stanley home and that she would hear Mrs. Stanley and Viola speaking; saw Jean LeFurgey there in the room with Mr. & Mrs. Stanley and knew that Jean spent a portion of her vacation with the Stanleys in 1934 and that in October, 1933, she saw the LeFurgeys at the Stanley home the morning after Mrs. Ware was buried and she knew that the children or Mr. & Mrs. LeFurgey were at the Stanley home at the time and place indicated.

The proponent having rested the case, Mrs. Viola LeFurgey again testified of the signing of the will on the dining room table; that she was seated at the table, but did not remember where Mr. Stanley was seated: "we read the will there at that time" stated the witness further.

Mr. Sawyer was handed a paper to examine and state whether it was Mr. Stanley's signature. Witness replied, "I think so. * * * A man's signature varies. Take a man that smokes all day, it may be rocky at night, different to what it is in the morning."

The contestant introduced Mr. H. R. Stanley who testified of letters received from the alleged testator; that he found the same among his father's effects, the purport of one of the letters being of the sickness, death and funeral of Mrs. Stanley, and that this correspondence was of a friendly nature.

This is, in effect, the salient parts of the testimony contained in the voluminous record.

■ We have carefully examined all the evidence and are of opinion and hold that the verdict is clearly against the weight of the evidence, and being wrong and unjust said judgment is set aside and a new trial granted. Birmingham Nat. Bank v. Bradley, 116 Ala. 142, 23 So. 53; Jena Lumber Co. v. Marlowe Lumber Co., 208 Ala. 385, 94 So. 492; Nashville, C. & St. L. v. Crosby, 194 Ala. 338, 349, 70 So. 7; Cobb v. Malone, 92 Ala. 630, 9 So. 738.

The judgment of the circuit court is reversed and the cause is remanded for retrial.

Reversed and remanded.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.